United States District Court
Northern District of Indiana

| | |
|---|---|
| DAWN CUMINGS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DEKALB COUNTY, INDIANA; DEKALB )<br>COUNTY SHERIFF'S DEPARTMENT; )<br>FORMER DEKALB COUNTY SHERIFF )<br>JOHN DENNIS and ADAM FRIEDEL, )<br>)<br>Defendants. ) | Civil Action No. 1:12-CV-52 JVB |

**OPINION AND ORDER**

The events giving rise to this litigation culminated on March 26, 2010, when Plaintiff Dawn Cumings's estranged husband, against whom she had an order of protection, shot the Plaintiff and held her hostage for six hours before he was shot and killed by police officers. Although the Plaintiff survived the ordeal, the gunshot wound to her leg required multiple surgeries, and her leg was eventually amputated. The Plaintiff has sued Dekalb County, Indiana, the Dekalb County Sheriff's Department, Former Dekalb County Sheriff John Dennis, and Adam Friedel, alleging that they are liable to her pursuant to 42 U.S.C. § 1983 because their conduct, actions, customs, policies, and practices deprived her of due process rights guaranteed by the Constitution.

Before the Court is the Defendants' Motion for Summary Judgment [ECF No. 22], and accompanying Memorandum of Law [ECF No. 23], the Plaintiff's Memorandum of Law in Opposition to Summary Judgment [ECF No. 29], the Defendants' Reply in Support of Their Motion for Summary Judgment [ECF No. 31], and the parties' designated evidence.

**STATEMENT OF FACTS**

On February 1, 2010, deputies of the DeKalb County Sheriff's office were twice called to the residence of Dawn (the Plaintiff) and Wayne King (King). When the deputy arrived the first time, King was not at the house. The deputy advised the Plaintiff to obtain an attorney to assist her with a protective order and to call 911 if King returned to the residence. Later that day, another deputy was dispatched to the residence in response to a call. When he arrived, both the Plaintiff and King were present and they were arguing over who was going to stay at the residence. When they were unable to resolve their dispute, the Plaintiff requested that the deputy stay at the residence until she obtained personal property for herself and her daughters, who would be leaving the residence. The deputy stayed until the Plaintiff left with her daughters.

On February 3, 2010, the Plaintiff obtained a protective order against King. The order prevented King from, among other things, harassing, annoying, telephoning, or contacting the Plaintiff directly or indirectly. Deputy Adam Friedel and two other deputies, Mike Keesler and Roger Watson, went to the King residence to serve the protective order and to make King leave the residence. King was upset and angry about the situation, but eventually left after about an hour.

The next time the Plaintiff contacted the Sheriff's Department was on March 9, 2010. The Plaintiff explained that King's brother, Jamie Shirks, sent her a text message that he had picked up his motorcycle from her garage. The Plaintiff was concerned because she had changed the locks and did not know how Shirks got inside the garage. The deputy spoke to Shirks, who indicated that the back door to the garage was unlocked and that he had not intended to cause any problems. The deputy informed Shirks that the Plaintiff no longer wanted Shirks to store his bike at the house or to come on the property. The deputy relayed his conversation to the Plaintiff

2

and there were no further incidents involving Shirks.

On March 12, the Plaintiff went to the DeKalb County Sheriff's Department to complain about text and phone messages that King had left on her cell phone. She reported that King had sent 46 threatening text messages and recorded 12 threatening voice messages in 11 days.[1] Sergeant Larry Kees looked at the index on her phone, and collected the dates and times of the messages and voicemails. He asked the Plaintiff to provide a written statement and to contact her cell phone provider for records evidencing the messages. He informed her that if she had problems obtaining the records, to inform him so that a subpoena could be issued. On March 19, the Plaintiff returned to the Department with a written statement and the phone records. Sergeant Kees attempted to contact King using the phone number provided by the Plaintiff, but was unable to do so. On March 22, Sergeant Kees completed an affidavit of probable cause, affirming his belief that King had violated the protective order from February 25 to March 8 when he contacted the Plaintiff through texts and telephone calls, and that this constituted the offense of invasion of privacy. He did not file the affidavit with the prosecutor because he was waiting for the prosecutor to respond to his request to obtain King's cell phone records, and did not believe that the prosecutor would proceed without King's records.

On March 16, before the Plaintiff returned with her phone records and written statement, she called the Sheriff's Department to report that King had entered her home in violation of the protective order, but was already gone. Because a Waterloo police officer was in the area, he responded to the call. The Plaintiff informed the officer that, before she called the police, she ran

---

[1] There is no indication in the record as to the actual content of the messages, or what King threatened in them.

into her bedroom and hid in the closet. The Plaintiff could hear King opening and closing the doors to other rooms in the house. King found the Plaintiff in the closet with the phone. When she told King that the police were on the phone and he better leave, King ran out of the house and drove away. The officer observed damage to the overhead garage door; it appeared that King had opened it about 12 to 18 inches and crawled under it. The officer then asked the Plaintiff for a written statement. His incident report concluded that King knowingly and intentionally entered the property in violation of the protective order. On March 18, the Plaintiff called Sergeant Kees and left a message to inform him of the March 16 break-in. She spoke to him on March 19 to inquire about the status of the report from the Waterloo officer, and Sergeant Kees indicated that he would check with the Waterloo Police Department.

On March 20, the Plaintiff contacted the Department to request that an officer be dispatched to her residence because a friend who had driven past her house noticed that the garage door was slightly raised. Deputy Josh Hurley responded. He concluded that someone had broken into the residence through a side door and caused significant damage to personal property inside the house, including putting a hole in a television screen by throwing a candle holder at it, breaking a curio cabinet, throwing a coffee table at the wall, knocking over potted plants, breaking a glass coffee pot, knocking out a cabinet door panel, and throwing a television at a lamp. Deputy Hurley photographed the damage and secured three pieces of property for processing as evidence; a blood stained couch cushion, a candle holder with fingerprints on it, and an entry door that had been forced open and was marked with fingerprints. Deputy Hurley also documented a boot print with a distinctive diamond pattern.

In connection with his investigation, Deputy Hurley contacted King and requested that he

come to the Sheriff's Department for an interview. During questioning, King acknowledged that he was not supposed to be at the residence, and denied having been there since February 3 when he had packed his belongings in a rented van. Deputy Hurley noticed that King had cuts on his hands and nose, and photographed these injuries. When Deputy Hurley requested an impression of King's boots to compare to those at the scene, King refused, stating that they were not the same boots he had the previous day and telling Deputy Hurley that he would have to get a warrant. However, Deputy Hurley did secure a styrofoam cup that King drank from during the interview, which he submitted for DNA processing. The cup, along with the items of evidence collected from the residence, were sent to the State lab for testing. Additionally, on March 21, King returned to the Department to allow Deputy Hurley to photograph his boots and get an ink print. However, they were not the same boots King had been wearing at the time of the interview. When Deputy Hurley told King they were not the same boots, King responded that they were the only boots he owned.

On March 22, a dispatcher informed the Plaintiff that the Waterloo Police Department had completed a report regarding the March 16 break-in and forwarded it to the prosecutor's office. The dispatcher also discussed other aspects of the Plaintiff's situation and King's violations of the protective order. On March 25 and 26, the Plaintiff left a message requesting that Deputy Hurley call to update her on the break-in investigation and whether he had arrested King for violating the protective order.

March 26 was the day that King shot the Plaintiff and held her hostage.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, a nonmovant must be able to show that a reasonable jury could return a verdict in her favor; if she is unable to "establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), summary judgment must be granted. A bare contention that an issue of fact exists is insufficient to create a factual dispute, but the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). A material fact must be outcome determinative under the governing law. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598–99 (7th Cir. 2000). "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008).

## ANALYSIS

To prevail on a § 1983 claim, a plaintiff must show that she was deprived of a right secured by the Constitution or laws of the United States and that the deprivation was caused by a person acting under color of state law. *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). The Defendants assert that the Plaintiff cannot establish the deprivation of a right secured by the

Constitution because there is no constitutional right to protection from the acts of a third party. *See Sandage v. Bd. of Comm'rs of Vanderburgh Cnty.*, 548 F.3d 595, 596 (7th Cir. 2008) (holding that because the constitution does not require state actors to provide services there was no cause of action for murder victims' families even if the defendants were reckless in failing to act on complaints of harassment); *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989) (stating that the Due Process Clause does not impose a duty on the State to protect any individual against private violence). Additionally, there is no constitutional right to enforcement of a restraining order. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 768 (2005) ("[T]he benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause."). The Plaintiff does not dispute these principles of law, but contends that the analysis falls short because state actors are liable under § 1983 if they create or enhance the danger of private violence. Under that theory, the Plaintiff argues that the Defendants are liable because their combination of "repeated inaction and affirmative indifference" to her complaints about King's violations of the protective order "emboldened" King to "escalate his violent behavior." (Mem. of Law in Opp'n to Summ. J. 1, ECF No. 29.)

In *DeShaney*, the Supreme Court recognized that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." 489 U.S. at 198. One of the limited circumstanced recognized in the Seventh Circuit is the state-created danger exception. The Circuit has established a three-part test to evaluate claims of substantive due process violations under the state-created danger exception. *King v. E. St. Louis Sch. Dist.*, 496 F.3d 812, 817 (7th Cir. 2007); *see also Jackson v. Indian*

*Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011). To meet the first element, the state, by its "affirmative acts," must have "create[d] or increase[d] a danger faced by an individual." *King*, 496 F.3d at 817–18. Second, the state's failure "to protect an individual from such a danger must be the proximate cause of the injury to the individual." *Id.* at 818. Third, "the state's failure to protect the individual must shock the conscience." *Id.* A plaintiff must establish all three elements. *See id.* (declining to explore in depth the first two components of the state-created danger claim because the case could be resolved expeditiously on the third element); *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 828 (7th Cir. 2009) (resolving state-created danger claim by analyzing second prong of the analysis). This case can be resolved on the first prong.

**A.     No Affirmative State Acts Created or Increased the Danger Faced by the Plaintiff**

There is no question that the Plaintiff faced a potential danger from her estranged husband. It is the reason she obtained a protective order and sought to have it enforced. It cannot be argued that the Defendants created this danger. Thus, to be liable the Defendants must have taken action that increased the danger to the Plaintiff. To increase the danger, the state must have done "something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Sandage*, 548 F.3d at 600. "Increase" is interpreted narrowly so as not to undo *DeShaney*; there must be more than a causal relationship between inaction and harm. *Id.* at 599.

An example of the type of action that provides a basis to apply the exception is found in the facts of *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998). Thomas Monfils provided an anonymous tip to the police about the criminal activity of one of his co-workers. Monfils

requested that the tape recording of his telephone tip not be released because he feared a violent retaliation if his co-worker found out. He was assured that the recording would not be released. Ultimately, the police released the tape to the accused co-worker, who recognized Monfils's voice. Monfils's co-worker murdered him within hours of receiving the tape. The Seventh Circuit found an actionable claim under the state-created danger exception because the state created a danger that Monfils would not otherwise have faced. *Monfils*, 165 F.3d at 518, 520.[2] Additionally, the Seventh Circuit found that the state's behavior affirmatively created or increased a danger faced by an individual in *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979), where police officers left children alone in an abandoned car after arresting the driver of the car. Finally, in *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), the court applied the exception when an intoxicated driver caused a head-on collision after police officers arrested the original, sober, driver of a car and left the drunk passenger behind.

The court found no state-created danger in *Windle v. City of Marion*, 321 F.3d 658, 661 (7th Cir. 2003). In *Windle*, the victim-plaintiff was being sexually molested by a teacher at her middle school. 321 F.3d at 659–60. For at least two months, police officers intercepted the plaintiff's phone calls and learned from the plaintiff's conversations that she was being molested

---

[2] Judge Richard Posner, has noted that the holding in *Monfils* may have been superseded by the Supreme Court's decision in *Castle Rock*. *See Sandage*, 548 F.3d at 599. He wrote:
> Although the Supreme Court . . . rejected the argument that Colorado had created a [property] right to the enforcement of restraining orders, the Colorado statute that was claimed to create the right did say that "a peace officer shall use every reasonable means to enforce a valid restraining order," 545 U.S. at 759, 125 S.Ct. 2796, and it is hard to see what difference there is between a statute that commands enforcement and the promise not to endanger Monfils by revealing that he was the informant. In both cases there is a commitment to protect, and if the statutory commitment is not enforceable under the Fourteenth Amendment, it is difficult to see why a promise should be.

*Id.*

by her teacher. *Id.* at 660. Although the officers had sufficient information to launch an investigation and intervene on the plaintiff's behalf, the officers did nothing. *Id.* The court held that the officers' failure to intervene for two months did not increase the danger. *Id.* at 661–62. The Seventh Circuit reasoned that if the police had never been involved, the danger to the plaintiff would have been the same or worse. *Id.* at 662. Moreover, the court noted that failure to act does not fulfill the requisite that an act be affirmative. "The term 'affirmative act' suggests a willful deviation from the *status quo*. Thus an affirmative act will have as a counterpoint a non-affirmative position. Typically, this involves inaction." *Id.* at 662 n.2.

The question then, is whether Defendants failed to protect the Plaintiff from a danger that they, by affirmative action, created or made worse. The Plaintiff argues that they did when they condoned King's unlawful actions. Relying on the Second Circuit's decisions in *Okin v. Village of Cornwall-On-Hudson Police Department*, 577 F.3d 415, 428 (2d Cir. 2009), and *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir. 2005), the Plaintiff asserts that "[g]iven [King's] knowledge of [her] complaints [about him], and the absence of consequences for his wrongful conduct, Defendants' conduct resulted in an implicit, but affirmative, condoning of [King's] unlawful actions." (Mem. of Law in Opp'n 18.)

In *Pena v. DePrisco*, a New York City police officer, Joseph Grey, who was known to have a history of drinking problems, continued to drink heavily throughout his employment, including in public and with full knowledge of his supervisors in the police department. 432 F.3d at 103. On one such occasion, Grey began a twelve hour drinking binge after ending his shift at 8:00 AM. He started drinking in the precinct parking lot. His supervisor then asked Grey to drive him to a local strip club, where Grey and other officers continued to drink. After four or five

hours, Grey's supervisor asked Grey to drive him back to the precinct, where Grey went inside to use the bathroom. Even though he was visibly intoxicated, none of his supervisors or fellow officers attempted to stop him from getting back into his car. Grey drove back to the strip club to continue drinking until it was time for him to return to the precinct for his next shift. On his way, at around 9:00 p.m., Grey sped through multiple red lights and—without sounding his horn or braking— struck and killed multiple pedestrians as they attempted to cross the street in accordance with the "walk" signal.

The surviving relatives and administrator's of the victims' estates brought a civil action that included a claim that the defendant officers and the City of New York violated their substantive due process right to be free from state-created dangers. In consideration of this claim, the court, citing the Supreme Court's decision in *DeShaney*, recognized that a state's failure to protect a person from private violence does not constitute a due process violation. *Pena*, 432 F.3d at 108. However, the court acknowledged the state-created danger as a theory of liability that was consistent with *DeShaney*. *Id.* at 108–09. The court concluded that when "state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct . . . even though none of the defendants are alleged to have communicated the approval explicitly." *Id.* at 111. In so holding, the court answered the question left open in a previous case whether "repeated inaction by government officials over a sustained period of time, without explicit advance approval or encouragement of the misbehavior in question, might effectively constitute an implicit 'prior assurance' rising to the level of an affirmative act." *Id.* at

11

110 (citing *Dwares v. City of N.Y.*, 985 F.2d 94 (2d Cir. 1993), a case in which the state itself facilitated and encouraged the private attack at issue when they told "skinheads" in advance of an attack that they would not interfere with any assaults or make arrests for attacking a participant in a political rally who had burned an American flag). The court noted the necessity to "tread a fine line between conduct that is 'passive' . . . and that which is 'affirmative'" when addressing a state created danger claim, *id.* at 109, and determined that allegations that defendant officers failed to interfere when misconduct was taking place were not sufficient to amount to a state created danger, *id.* at 110, but that the allegations that defendants encouraged Grey to drink to excess and communicated that he could drive in that condition without fear of punishment were sufficient to state a claim, *id.* at 110–11. The plaintiff's claim in *Pena* was sufficient to state a constitutional violation because "the type of claim [the court] understand[s] the plaintiffs to assert is based on *more* than a failure to prevent misbehavior and to reprimand or punish the miscreants. The plaintiffs assert that prior assurances of impunity were actually, albeit implicitly, communicated." *Pena*, 432 F.3d at 112 (emphasis added).

In *Okin v. Village of Cornwall-On-Hudson Police Department*, a domestic abuse victim brought a § 1983 action against the town and village police departments alleging that their response to her complaints of abuse perpetrated by her live-in boyfriend, Roy Charles Sears, violated her due process rights. 577 F.3d 415. When Sears began physically abusing the plaintiff, she repeatedly called police for assistance over a fifteen-month period. An incident report was created for her first report of violence, but Sears was not interviewed and no charges were filed. According to the plaintiff, the officers treated her in a derogatory manner when she expressed her desire to press charges, and the only conversation the officers had with Sears was to discuss

12

football. *Okin*, 577 F.3d at 421. A few days later, she again called police to report that Sears was beating her. She contends that the responding officer laughed at her for making the complaint and did not make a written report. *Id.* Throughout the months that followed, the plaintiff alleged that the police were dismissive of her, failing to acknowledge or investigate her complaints of Sears's threats and abuse. She stated that Sears had even admitted to the police chief that he smacked the plaintiff around and could not help doing so. *Id.* at 420, 427.

In consideration of the state-created danger due process claim, the court held that the plaintiff had not shown a genuine issue of material fact whether the defendants affirmatively enhanced the risk of violence by making "explicit assurances" to the Sears that he could act with impunity. 577 F.3d at 429. However, relying on previous Second Circuit cases, including *Pena* and *Dwares*, the court stated that "explicit approval of violence is but a subset of the affirmative conduct by state actors that can enhance the danger to a victim. The affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Id.* The court held that the evidence, when it was viewed in a light most favorable to the plaintiff, could support an inference that the defendants' actions rose to the level of affirmative conduct that created or increased the risk of violence to the plaintiff. *Id.* at 429–30.

The court reasoned that the plaintiff "would be more vulnerable once Sears was aware of the officers' dismissive and indifferent attitude toward [the plaintiff]'s complaints, as such awareness nullifies the deterrent capacity of police response." *Id.* at 430. This is because the "implied message" of their conduct "may have galvanized Sears to persist in violent encounters with [the plaintiff]." *Id.* Therefore, the court concluded, "[a] reasonable factfinder undoubtedly

could conclude that defendants, by their affirmative conduct, enhanced the danger to [the plaintiff] because they conveyed to Sears that he could continue to engage in domestic violence with impunity." *Id.* at 430–31.

There is no Seventh Circuit case extending the concept of affirmatively creating or increasing a danger to include action that communicates, explicitly or implicitly, that violence by an individual against another will go unpunished, particularly under circumstances like those present in *Okin*, which includes numerous failures to act. *See Okin*, 577 F.3d at 430 (noting that the defendants ignored Sears's admission that he could not help it sometimes when he smacked the plaintiff around, and responded to the plaintiff's complaints without filing a domestic incident report, interviewing Sears, or making an arrest). The Court need not decide whether *Okin* would exceed the Seventh Circuit's outer bounds of affirmative action because, even assuming that the standard in *Okin* is consistent with Seventh Circuit precedent, the facts in this case are distinguishable.

Here, the Plaintiff's state-created danger claim is premised on the fact that the Defendants only initiated investigations as separate and distinct criminal actions, and failed to arrest King immediately for violations of the protective order. Any of the acts that can only be characterized as inaction, such as the failure to arrest King or the failure to send the matter to the prosecutor sooner, cannot form a basis for finding that the Defendants increased the danger the Plaintiff faced. *See Windle*, 321 F.3d at 662 (rejecting the plaintiff's attempts to characterize the defendant's "inaction as an affirmative choice," and to premise claims on that inaction because the "inert failure to protect" is different than "the proactive creation or exacerbation of danger"). There must be some affirmative conduct accompanying the inaction, even as there was in *Pena*

and *Okin*. In *Pena*, the court took care to identify "sufficient affirmative acts to violate substantive due process rights." 432 F.3d at 110. These acts were present when supervisory personnel encouraged officer Grey to drink alcohol excessively and to drive while intoxicated by, first, drinking with Grey and, then, asking Grey to drive to a drinking establishment and, after additional drinking, back to the precinct. In *Okin*, the case turned on whether the message conveyed by the affirmative conduct, even if not explicitly, constituted official sanction of private violence. 577 F.3d at 429. The affirmative conduct included officers discussing football with Sears during their response to the plaintiff's complaint that he had beaten and tried to choke her, and openly expressing contempt for the plaintiff.

    Here, there is no evidence from which a reasonable jury could conclude that the Defendants communicated, explicitly or implicitly, that the state would not attempt to hold King legally accountable for violations of the protective order or other unlawful conduct. None of the Defendants' actions could reasonably be inferred as sanctioning King's private violence or communicating to King that he could commit violence against the Plaintiff with impunity. First, there is no evidence that the Defendants displayed a mocking, dismissive, or indifferent attitude toward the Plaintiff's complaints, much less that King was aware of any such attitude or that it was displayed in his presence. In fact, three deputies from the Sheriff's Department initially served and enforced the protective order, despite King's unwillingness to comply. The Defendants did not inform the Plaintiff that her complaints were frivolous, that she should not contact the Department, or that they would not investigate her complaints. In *Okin*, only one of the plaintiff's numerous complaints even resulted in an incident report and the responding officers repeatedly failed to identify the plaintiff as a victim, to identify a suspect, or to

characterize her complaints as domestic abuse. Additionally, they ignored an admission of abuse. Here, by contrast, the Defendants generated reports and undertook investigations. Before the hostage situation on March 26, Deputy Hurley had interviewed King in connection with the significant property damage done inside the Plaintiff's home on March 20 and identified him as a suspect. The purpose of the interview was clearly communicated to King, and King denied being at the house. Thus, King made no admission of any illegal conduct. Deputy Hurley even photographed King's injuries and asked for impressions of his boots to compare to those found at the residence. He also asked to see King's phone and inquired whether he would submit to a polygraph test if one was requested. Deputy Hurley's conduct did not give King the impression that law enforcement was disregarding the Plaintiff's reports.[3]

King may have assumed that some of his violations would not bring consequences due to the time that passed after his violations without an arrest. Even if that inference is granted, the Court cannot find support for the proposition that the Department engaged in conduct that encouraged intentional violence against the Plaintiff or affirmatively communicated that King could act with impunity with respect to her. Even if the Defendants, by their alleged inadequate responses, communicated to the Defendant that it was acceptable for King to have contact with the Plaintiff through text and phone messages, their actions certainly did not communicate that the police would tolerate physical violence against the Plaintiff.

The Seventh Circuit has stated that "cases in which [the court has] either found or

---

[3] The Plaintiff includes in her opposition to summary judgment facts pertaining to Defendant Friedel's familiarity with King—specifically, that Friedel spoke to King frequently when Friedel was a jailer and King was incarcerated at the Dekalb County Jail. Additionally, Friedel saw King a few times around town after he got out of jail and exchanged pleasantries for a few minutes. The Plaintiff does not indicate how these facts impact the legal analysis, and the Court considers them irrelevant to whether the Defendants, through their affirmative conduct, increased the danger that King posed to the Plaintiff.

suggested that liability attaches under the 'state-created danger' exception are rare and often egregious." *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1022 (7th Cir. 2003). The release of an informant's tape to the target of his information in *Monfils v. Taylor*, and removing a sober driver and leaving an intoxicated passenger behind with keys as in *Reed v. Gardner*, meet this requirement. This case does not. At worst, the Defendants' actions in this case were insufficient to prevent the danger, thus placing this case squarely in the ambit of *DeShaney*. *See Sandage*, 548 F.3d at 600 (increasing an existing danger requires that "the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence"). The danger the Plaintiff faced was created by King, and King alone; the Defendants' actions did not take steps that greatly increased the danger of violence that King otherwise posed to her. They placed the Plaintiff in no worse position than if they had not acted at all. To find otherwise would be to ignore the important distinction between endangering and failing to protect. *Sandage*, 548 F.3d at 599 (warning that "'create *or increase*' must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect").

The designated evidence, even when it is construed in a light most favorable to the Plaintiff, does not create a triable issue whether the Defendants' affirmative acts created or increased the danger that King would perpetrate violent acts against the Plaintiff. In addition, no reasonable jury could conclude that the Defendants' actions shock the conscience, another necessary element of a state-create danger claim.

**B.     The Defendants' Actions Do Not Shock the Conscience**

As a matter of law, there is no basis in the record to characterize the Defendants' response to the Plaintiff's complaints about King as shocking the conscience. Using a fact-bound inquiry, the Court must determine whether the official conduct was toward the more culpable end of the spectrum of tort law liability. *King*, 496 F.3d at 818–19. "[W]hen the circumstances permit public officials the opportunity for reasoned deliberation in their decisions, [the court] shall find the official's conduct conscience shocking when it evinces a deliberate indifference to the rights of the individual." *Id.* at 819 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998); *Armstrong v. Squadrito*, 152 F.3d 564, 576–77 (7th Cir. 1998)). When the circumstances render reasoned deliberation impractical, such as those calling for hurried judgments to protect the public safety or maintain the public order, "conduct must reach a higher standard of culpability approaching malicious or intentional infliction of injury before" it will be considered "conscience shocking." *Id.* (citing *Lewis*, 523 U.S. at 852–53). In all cases, "the conduct must be more culpable than mere negligence, which is 'categorically beneath the threshold of constitutional due process.'" *Id.* (citing *Lewis*, 523 U.S. at 849); *see also Jackson*, 653 F.3d at 654–55 (noting that "[o]nly 'the most egregious official conduct' will satisfy this stringent inquiry" and that "[m]aking a bad decision, or even acting negligently, does not suffice to establish the type of conscience-shocking behavior that results in a constitutional violation").

Here, the Defendants had time for reasoned deliberation in their decisions, and their conduct will thus shock the conscience if it evinced a deliberate indifference to the Plaintiff's rights. Deliberate indifference, in the Fourteenth Amendment context, is the "'conscious disregard of known or obvious dangers.'" *Armstrong*, 152 F.3d at 577 (quoting *West v. Waymire*, 114 F.3d 646, 651 (7th Cir. 1997)). The conduct the Plaintiff challenges relates to the

Defendants' decisions regarding the manner of investigation, when to turn information over to the prosecutor, and when to arrest King. In making these decisions, the Defendants responded to the Plaintiff's emergency calls, requested telephone records, took written statements, interviewed King and identified him as a suspect in a break-in, and collected evidence and forwarded it to a lab for processing. Even construed in light most favorable to the Plaintiff, the actions of the Defendants can only be characterized as a failure to act quickly enough to criminally charge King with violations of a protective order—violations that included telephone contact, and breaking into the Plaintiff's house. It cannot reasonably be construed from the record that the Defendants' speed evidenced a lack of concern for the Plaintiff's welfare and safety. At no time prior to March 26 had King physically harmed the Plaintiff or displayed a weapon. The Defendants' response, even under a generous interpretation, can at most be considered negligent for failing to consider that King's conduct would escalate to violence before the investigation on the break-in would yield an arrest.

As tragic as the results of this case are, the Defendants' actions cannot fairly be described as an implicit acceptance of, and a deliberate indifference to, violence towards the Plaintiff.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Defendants' Motion for Summary Judgment [ECF No. 22]. The Clerk will enter judgment in favor of the Defendants and against the Plaintiff.

SO ORDERED on September 12, 2013.

                                               s/ Joseph S. Van Bokkelen
                                               Joseph S. Van Bokkelen

                                                  United States District Judge
                                                  Hammond Division